JOY COSSICH LOBRANO, Judge.
|, The defendant, Kevin Taylor, was charged by bill of information with simple burglary of an automobile belonging to Rebecca Paz, a violation of La. R.S. 14:62(A). He pleaded not guilty.
Prior to trial, the State filed a Prieur motion, noticing its intent to offer evidence of the defendant’s previous arrest for stolen property, as well as testimony regarding three other police reports wherein the defendant was arrested and found to be in possession of stolen property taken from several different automobiles. The defendant filed a Notice of Alibi, giving notice of his intent to present John Woods and Luis Lizama as alibi witnesses who would authenticate a time sheet and verify his presence at work on the date of the incident.
After numerous continuances, the case proceeded to a jury trial on January 11, 2011, at which time the defendant’s simple burglary charge was tried with other pending misdemeanor charges.[1] On the first day of the trial, the trial court granted the Prieur motion and denied a request by the defendant for a continuance due to the non-appearance of Woods, his alibi witness.
^Following the trial, the jury returned a unanimous verdict of guilty as to the simple burglary charge. The trial court sentenced the defendant to twelve years at hard labor with credit for time served, to run concurrently with any other sentence.
The State filed a multiple bill of information charging the defendant to be a habitual offender, and the defendant filed a motion to quash the multiple bill. Following a multiple bill hearing, the trial court denied the motion, finding the defendant to *259 be multiple offender.[2] The defendant filed a writ application, seeking review of the trial court’s denial of the motion; this Court denied the writ as untimely.[3] Following a sentencing hearing on the multiple bill, the trial court adjudicated the defendant a multiple offender, vacated his previous sentence and sentenced him to twenty-four years at hard labor with credit for time served, to run concurrently with any other sentence, pursuant to La. R.S. 15:529.1.
The defendant timely appealed.
The testimony of Rebecca Paz established that the previous year,[4] she and her boyfriend were on Clio Street in New Orleans, Louisiana, assisting her boyfriend’s uncle, Greg Surry, with the opening of a restaurant. Paz recalled that when she parked her vehicle, the doors were locked and all of the windows were up. As Paz and her boyfriend were sweeping inside the restaurant, Surry, who lived across the street from the restaurant and had heard the sound of glass breaking, came over and alerted her that someone had broken into her vehicle. Paz testified that she ran outside to find that the window of her car had been smashed Lopen, and that her purse had been taken from her vehicle, which contained her digital camera, prescription medication (Amoxicillin), and In-visalign teeth trays.
Paz did not personally observe the burglary to her vehicle or hear the window break, although she was across the street from where her vehicle was parked at the time. Paz further testified that she did not see anyone running away from the vehicle, but became aware that a person whose name she did not know “said that they were chasing after somebody for me.” She did not observe the person chasing the perpetrator, but observed him coming back down the street. After standing outside for a few minutes, Paz called the police, but she could not recall exactly which items she had reported to the police as being stolen. Paz said that she did not know the defendant and had not given anyone permission to use her car.
Ryan Haigler testified that on the morning of July 18, 2009, around 11:00 a.m., he was at the intersection of Clio and Caron-delet Streets on his apartment balcony, which faced the intersection. While on his balcony, he observed a man sitting on the edge of a planter on the corner of Caron-delet and Clio Streets looking around very suspiciously for about three to four minutes. When asked what was suspicious, Haigler stated that “[p]eople don’t usually stop for a breather at that spot. It’s an unusual position to be sitting on the edge of a plant. And that’s why it took notice— took my notice at that time.” Haigler estimated that the man was approximately twelve feet away and that there was nothing obstructing his view of the man’s face. He recalled that the man was wearing “work clothes” that were “definitely a work uniform” and had a large purple bag. When asked whether he recalled if the man was wearing a vest, Haigler responded, “[the man’s clothing] |4was almost like a blue and — blue pants and maybe a — I don’t know. I can’t say as to a vest, you know. It’s been a while.”
*260 Haigler observed the man get up and pick up his belongings and walk toward the direction of the victim’s automobile, which was parked in front of another apartment building that was across the street from his building, and “around the corner just a bit.” Immediately thereafter, he “heard a smash, a window break, something of the sort.” Haigler claimed that he was unable to see the window break because the man had crossed over to Clio Street where he could no longer see him from the balcony.
After hearing the smash of glass, Hai-gler ran downstairs and out of his apartment building, at which time he observed “the purple bag kind of going around the corner.” He estimated that it took him about thirty seconds to run from his balcony to the area in front of his apartment building, where he noticed that the man, heading against traffic on Carondelet Street, had “gone up by Martin Luther King by that point” and was “moving at a fast pace.” Haigler was unable to keep up with the perpetrator because he was barefoot. At that point, he relocated back to Paz’s vehicle and spoke to Paz. Haigler also spoke to police that same day regarding the incident. When asked if he recalled giving the police a description of the perpetrator as having short hair and a medium build, Haigler responded that he was not sure, stating, “I mean, short hair, yeah. Definitely like extremely short hair, if any at all.”
On August 28, 2009, Haigler was shown a photographic lineup by police, which he identified in court. He also identified the defendant in open court. According to Haigler, he immediately identified the defendant from the lineup and |fisigned the back of the photograph. He said that the officers never indicated which photograph he should choose from the lineup or offered him anything for making an identification, nor did they threaten, coerce, or intimidate him into making an identification.
Rebecca Begtrup, another victim of an automobile burglary, testified at trial and confirmed that her car window had been smashed in and that her cell phone charger, some currency, and some compact discs had been taken from her vehicle. Begtrup identified the items in open court and confirmed that she did not know the defendant or give him permission to enter her vehicle.
Officer Edward Davis testified that on June 28, 2009, he responded to the call of an automobile burglary that had been reported by Lauren Archer, meeting her at Tulane University, her place of employment. Archer reported that the automobile burglary had occurred on Delechaise Street. Officer Davis observed that the driver’s side front window was shattered. He played no role in the follow-up investigation of the burglary.
Christine Vo, the manager of the Magazine Street Pawn Shop, testified regarding the procedure used when an individual pawns an item at the shop. When an individual pawns an item, after a price is agreed upon, the customer must present a valid form of identification, and a receipt is generated listing the customer’s name and address. Vo authenticated a receipt in defendant’s name for a pawned Husqvarna model 445 chainsaw, including the serial number. The address listed for the defendant on the receipt was 8314 Chippewa Street, and receipt was signed by both the defendant and an employee of the pawn shop. | r,Although she recalled the transaction taking place, Vo did not specifically recall the defendant by his face and did not know if he had been a prior customer.
Det. Robert Barrere investigated the report of a burglary from a truck on Erato Street wherein a Husqvarna chainsaw and *261 other items were stolen from the vehicle. As part of his investigation, Det. Barrere contacted the Magazine Street Pawn Shop, as well as other pawn shops, and learned that a Husqvarna chainsaw had been pawned at the Magazine Street Pawn Shop on the date that the burglary reportedly occurred. Det. Barrere was ultimately able to determine that the pawned chainsaw was the same chainsaw that was stolen from the truck in the Erato Street burglary, and he returned the chainsaw to its owner.
In addition to the Husqvarna chainsaw, other items were reported as stolen from the vehicle. Therefore, Det. Barrere and his supervisor relocated to the address listed on the Magazine Street Pawn Shop receipt as belonging to the defendant. After advising defendant’s mother, May Bell Taylor, that they were investigating a burglary, Ms. Taylor gave the officers permission to search the residence and directed them to the room used by the defendant. During the search, the officers observed numerous items that previously had been reported as stolen in the Sixth District area. The items included a Cobra radar detector; a cell phone charger that had been reported stolen by Rebecca Begtrup; a Saturn Ion CD case with the name Begtrup written on it; numerous credit cards bearing the name Lauren M. Archer; numerous gift cards; student identification cards and a health card in Rebecca Paz’s name; and a prescription pill bottle bearing Rebecca Paz’s name.
17After reviewing the police report that had been prepared by the responding officer, Det. Barrere subsequently compiled a six-person photographic lineup that included a photograph of the defendant and relocated to Haigler’s apartment building with Det. Matthew McCleary on August 28, 2009. Det. Barrere corroborated Haigler’s testimony regarding his immediate identification of the defendant from the photographic lineup.
Det. Barrere further testified that after meeting with Haigler for the photographic lineup identification, he relocated to the police station to prepare paperwork necessary to arrest defendant for simple burglary. Although he was not a responding officer on July 18, 2009, Det. Barrere read the report prepared by Officer Harper, the officer who initially handled the incident, before preparing his supplemental report. In the supplemental report regarding the burglary, Det. Barrere indicated that Hai-gler had provided a description of the defendant. However, because Det. Barrere was not a responding officer on the date of the burglary of Paz’s vehicle, he obtained Haigler’s description of the perpetrator from Sgt. Christopher Kalka, who spoke to Haigler at the scene. He recalled that his description of the perpetrator was “a black male, late 30’s, early 40’s. I don’t recall the clothing. I believe, you know, like a work vest, fluorescent work vest.”
When asked where he heard the term “work vest,” Det. Barrere responded that he believed he heard it from Sgt. Kalka pursuant to Sgt. Kalka’s interview with Haigler at the scene. Det. Barrere could not specifically recall whether there was a mention in the initial report of a fluorescent work vest, and he testified that to his knowledge, there was not mention of a fluorescent work vest in the initial report.
|sSgt. Christopher Kalka testified that he investigated an automobile burglary on July 18, 2009, and spoke to Haigler pursuant to his investigation. Sgt. Kalka’s recollection of Haigler’s description of the perpetrator was “a black male, very short hair, medium build, with dark brown complexion. He was wearing a navy blue basketball jersey, maybe like a LeBron James, Cleveland Cavaliers, basketball jersey, and jeans. But on top of the jersey, *262 he wore a fluorescent yellow-like a work vest.”[5] Sgt. Kalka further testified that he participated in the search of defendant’s residence, at which time “four fluorescent yellow work vests” were discovered.
Sgt. Kalka confirmed that although he reported to the scene at the time of the incident, Officer Harper wrote the initial incident report. Counsel for the defendant read in open court the description of the perpetrator in the initial police report, which did not specifically include a reference to a fluorescent work vest. Sgt. Kal-ka was also presented with a copy of a Sixth District crime bulletin attached to Officer Harper’s initial report. Sgt. Kalka testified that the purpose of this bulletin was to list missing property, to be on the lookout, and “just to notify everyone of some of the identifiable property that was taken and any perpetrator descriptions.” Sgt. Kalka read the description of the perpetrator in the bulletin in open court:
Okay. The only fields that are filled in [on the crime bulletin] are “Black male, medium build.” And the clothing description is listed as, “Blue sports jersey, blue jeans, short hair, with a backpack.” Height, weight, complexion, age, all of those, were left blank.
| aAfter the State rested, the defense called Luis Lizama, the Division Manager for IESI Southshore, a waste collection company. He confirmed that he knew the defendant, who was employed through a temporary agency with which IESI contracted. Although Lizama could not recall if the defendant was working on July 18, 2009, he confirmed that the defendant was employed by IESI on that date. He was not certain how long the defendant was employed by IESI.[6]
Lizama further testified that he was not familiar with the defendant’s individual work schedule, and that he had no independent recollection or firsthand knowledge of the defendant working on July 18, 2009. He testified that waste collection trucks begin any one of sixty-five routes at various times of the morning and at different locations, generally six days per week, and that a shift is generally eight to ten hours. The routes encompass various municipalities in Jefferson Parish and St. Charles Parish; IESI did not provide service to New Orleans. After stopping at a landfill, the trucks return to the IESI facility at 500 Bridge City Avenue.
The defendant testified that he stayed with his mother at her house from time to time and confirmed that he was staying at his mother’s residence on August 28, 2009.[7] *263 The defendant confirmed that he pawned the chainsaw, but maintained that |1(lhe found the chainsaw in the garbage in Ken-ner near a school, but could not recall the name of the school. The defendant insisted that he would not have pawned the chainsaw if he had been aware that it was stolen. When asked where he stored the chainsaw upon retrieving it from the trash pile, the defendant stated that the truck had “a little box on the side, on the side of the truck where we could store our stuff.” He denied breaking into a vehicle at Car-ondelet and Clio Streets. When questioned regarding the items belonging to Rebecca Paz that were recovered at his mother’s house, the defendant testified that he had no idea how the items got there.
The defendant testified that on July 18, 2009, he was employed with AMI, a temporary service agency; that AMI had a contract with IESI; and that he was “on the Kenner route” and had reported to work at approximately 4:30 or 5:00 a.m. for his shift, which lasted four to five hours. The defendant testified that to work for IESI, he was required to fill out a time sheet, and to sign in and out; however, sometimes the driver would sign the time sheet. When questioned regarding his uniform, the defendant testified that he could wear whatever he wanted, except that “we must wear a vest. If we don’t, we cannot ride on that truck.”
The defendant confirmed that he had been convicted of other felonies, including a theft conviction in 1989; a conviction for burglary of an automobile in a 1994 incident; and a “conviction in 2008 dealing with heroin.”
The defense rested; however, defense counsel requested a continuance until John Woods could appear, which the trial court denied.
A review of the record evidences no errors patent.
InThe defendant’s third pro se assignment of error alleges that the evidence was insufficient to support his conviction. Accordingly, this assignment of error will be discussed first.
When reviewing the sufficiency of the evidence to support a conviction, this Court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction “the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79. Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its suffi *264 ciency. State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Helou, 2002-2302, p. 5 (La.10/23/03), 857 So.2d 1024, 1027.
| i2A fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson v. Virginia, supra, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573-74. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
Simple burglary is defined as “the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60.”[8] This Court has recognized that “[t]o convict a defendant of simple burglary, the state must prove beyond a reasonable doubt that the defendant entered the structure or vehicle without authorization and had the specific intent to commit a felony or theft therein.” State v. Smith, 2006-0318, p. 5 (La.App. 4 Cir. 11/21/06), 946 So.2d 218, 221 (citing State v. Ewens, 98-1096 (La.App. 5 Cir. 3/30/99), 735 So.2d 89, 93). “Specific intent is a state of mind that need not be proven as fact but may be inferred from circumstances and the actions of the defendant.” State v. Smith, 2006-0318, p. 5, 946 So.2d at 221 (citing State v. Bailey, 00-1398 (La.App. 5 Cir. 2/14/01), 782 So.2d 22, 24).
11sThe defendant argues that Hai-gler’s testimony was unreliable, as he testified that he did not see the actual breaking of the car window, but only that he heard a smash and window breaking and investigated the noise. The defendant submits that La. R.S. 14:62 provides that the elements of simple burglary that must be proven are 1) entry into a structure; 2) that was unauthorized; and 3) the specific intent to commit a felony or theft therein. The defendant argues that Haigler’s testimony wherein he stated that he observed someone meeting the defendant’s description sitting across the street from his home was insufficient to establish that the defendant was the same person who burglarized Paz’s automobile. Furthermore, the defendant argues that the fact that Haigler testified that he saw a person with the defendant’s description running away from Paz’s vehicle after the sound of glass breaking was insufficient to establish that the defendant entered Paz’s vehicle.
The defendant further argues that when evidence is circumstantial, it must exclude every reasonable hypothesis of innocence. Defendant contends that this case is distin *265 guishable from State v. Conner, 2008-0473, p. 6 (La.App. 4 Cir. 10/1/08), 996 So.2d 564, 568, wherein the victim testified that she witnessed the defendant smash her car window, reach into her car, and remove the bag that was on the seat next to her.
In this case, the State presented the jury with testimony from Haigler, who testified that at the time of the incident he was at the intersection of Clio and Caron-delet Streets on his apartment balcony, which faced the intersection. While on his balcony, Haigler observed, from only twelve feet away, “a man sitting on the edge of a planter on the corner of Caron-delet and Clio looking around, you 114know, very suspiciously” for about three to four minutes. Notably, Haigler testified that he had an unobstructed view of the man’s face for the three to four minute period that he was watching the man. Haigler recalled that the man was wearing “work clothes” that were “definitely a work uniform” and that the man was carrying a large purple bag.
Haigler observed the man stand up with his belongings and walk towards the direction of Paz’s automobile, which was parked in front of a building that was across the street and “around the corner just a bit.” Immediately thereafter, Hai-gler “heard a smash, a window break,” but could not see the man at the moment of the window breaking because the man had moved out of his line of vision. Haigler testified that after hearing the smash of glass, he ran downstairs and out of his apartment building, at which time he observed “the purple bag kind of going around the corner” at a fast pace and heading against traffic on Carondelet Street towards Martin Luther King Boulevard.
Upon being shown a photographic lineup by the police, Haigler immediately identified the defendant as the man he observed sitting suspiciously on the planter before hearing the sound of glass breaking. Hai-gler also made an identification of the defendant in open court at trial.
Additionally, the State presented the jury with evidence of items that Paz had specifically reported as stolen from her vehicle that were discovered during the detectives’ search of defendant’s room, including student identification cards, a health card, and a prescription pill bottle bearing Rebecca Paz’s name, as well as various other items that had been reported as stolen in other recent automobile burglaries. Considering the evidence presented to the jury at trial, viewed in a light 115most favorable to the State, the jury could conclude that the defendant was guilty of simple burglary of Paz’s automobile. See State v. Conner, 2008-0473, p. 6, 996 So.2d at 568. This assignment of error lacks merit.
In the first assignment of error, the defendant asserts that the trial court abused its discretion in denying a continuance due to the absence of John Woods, his alibi witness.
La.C.Cr.P. art. 707 governs motions for continuances in criminal cases and provides:
A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial.
Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice.
La.C.Cr.P. art. 709 governs the procedure for a motion for continuance based *266 upon the absence of a witness and provides, in pertinent part:
A. A motion for a continuance based upon the absence of a witness shall state all of the following:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial.
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
| ,fiLa.C.Cr.P. art. 712 provides that “[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor.” [9]
In State v. Duplessis, this Court recognized that for a defendant to demonstrate prejudicial error, a defendant must demonstrate that the absent witness’ testimony would have been favorable to the defense as well as the possibility of a different result if the witness were to testify:
The right of a defendant to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served. This right is embodied in both the federal and state constitutions and in this state’s statutory law. State v. Lee, 446 So.2d 334 (La.App. 4th Cir.1984); United States Constitution, Amendment 6; La. Const. Art. I, sec. 16 (1974); La.C.Cr.P. art. 731.
However, in State v. Nicholas, 97-1991 (La.App. 4 Cir. 4/28/99), 735 So.2d 790, this Court stated that this right does not exist in a vacuum, and a defendant’s inability to obtain service of requested subpoenas will not be grounds for reversal of his conviction or new trial in each and every case. In order for a defendant to show prejudicial error, he must demonstrate that the testimony of the absent witness would be favorable to the defense and would indicate the possibility of a different result if the witness were to testify. See also, State v. Green, 448 So.2d 782 (La.App. 2 Cir.1984).
Prejudicial error arises where the absent witness is “vital” to the defense. State v. Peterson, 619 So.2d 786, 790 (La.App. 4 Cir.1993).
State v. Duplessis, 2000-2122, pp. 12-13 (La.App. 4 Cir. 3/28/01), 785 So.2d 939, 947 (emphasis added).
| ,7As previously noted, counsel for the defendant moved for a continuance after the sidebar conference during Lizama’s testimony, at which time the trial court sustained the objection to the introduction of an unauthenticated document. However, defense counsel did not indicate on the record specifically which witness was needed to authenticate the document:
[Counsel for the defendant]:
Is there a ruling of the Court on this issue?
THE COURT:
*267 The Court [is] going to sustain the State’s objection to that document.
[Counsel for the defendant]:
Your Honor, I would ask that the trial be continued until we can get someone here [to] authenticate the document.
THE COURT:
All right. The Court is going to deny the request for a continuance.
[Counsel for the defendant]:
And I will also put my intent to seek a supervisory writ in this matter, your Honor, and request a stay of these proceedings..
THE COURT:
Notice of intent to take writs noted. Stay denied.
[Counsel for the defendant]:
Okay. And note the defense’s objection, your Honor.
THE COURT:
Defense objection is noted.
Immediately prior to the close of trial, counsel for the defendant orally moved for a continuance specifically due to John Woods’ absence:
[Counsel for the defendant]:
If Mr. Woods hasn’t checked in, then I have no further witnesses, your Hon- or.
| iSThe Court:
Defense rests, subject to its introduction of its documents, D-One and Two?
[Counsel for the defendant]:
Yeah. And I would once again request a continuance and to leave the case open until I can have a chance to have Mr. Woods appear.
The Court:
Motion for continuance is denied. Has Mr. Woods checked in personally today?
[Counsel for the defendant]:
Not to me.
The Court:
All right.
[Counsel for the defendant]:
If Mr. Woods [has] checkfed] in with anyone, I don’t know.
The Court:
State, any witnesses in rebuttal?
After the close of trial and the jurors had been excused from the courtroom, the trial court allowed defense counsel to indicate on the record the need for John Woods’ testimony, which had apparently been discussed at the sidebar conference during Luis Lizama’s testimony:
THE COURT:
All right. We’ll finish the judge trial [on the misdemeanor charges] on the 28th. And just preserving something, we did it at sidebar during the trial, but just to make the record complete out of the presence — now that the jury has been dismissed — regarding the proffer of D-Three, that being the time sheet. And just allowing you to put something and the record and the State to counter that, so that the record bears out on appeal—
[[Image here]]
[Counsel for the defendant]:
Yes, your Honor. Thank you. The defense had intended, obviously, to present an alibi witness. That alibi witness was to be verified by a time sheet showing that he was at work at the time. That hatime sheet was authored by a man named John Woods, who was under subpoena to be here today. He’s been under subpoena since August to show up.
I believe he did show up once early on in the trial setting. However, he did not show up today. His mother came in and *268 said that he hasn’t been home for a few days. She hasn’t seen him.
I requested a continuance or a stay of the proceedings until such time as we could get him properly served and brought to court. This was a crucial piece of evidence that would have established an alibi for Mr. Taylor. And I attempted to get that time sheet in through another employee, a manager of the company named Luis Liza[m]a. The Court denied my request to do so.
So what — we object to the Court’s ruling on that. I do intend to seek a writ pre-sentencing.[10] And that’s my record.
After the State presented its arguments, the trial court stated its reasons for sustaining the State’s objection to the document, which was not an original copy of the document and had a handwritten date, but no year:
And the Court’s ruling was based on that, its review of the proffered document, that being a time sheet [R. 59-60]. It was not an original. It looked like a Xeroxed filled-in sheet. It did not even have a year on it. It had handwritten “July 18th,” but no year on it.
And, again, Mr. Liza[m]a could not testify that he was either the bookkeeper or the time sheet custodian or any other type of link to the document which would, A, verify that that document was, in fact, an IESI or a temp agency document and [B,] that that document had been generated by the agency.
And, therefore, without any foundation for its admissibility, the Court sustained the State’s objection to that document being put before the jury, as the Court felt it would mislead or confuse the jury. And, again, there was no foundation for its being validated or authenticated as a true document from that company.
The defendant argues that the requirements of La.C.Cr.P. art. 709 are met because John Woods’ status as an alibi witness satisfies the first requirement of the Article (the motion shall state facts to which the absent witness is expected to 120testify, the materiality of same, and the necessity for the witness’ presence at trial), while the fact that Woods was subpoenaed for trial satisfies the latter two requirements (facts demonstrating that the witness will be available at the time to which trial is deferred and facts showing due diligence was used in the effort to procure the attendance of the absent witness). The defendant argues that the trial court’s denial of his request for a continuance without reasons violated his Sixth Amendment right to compulsory process as well as a right to a fair trial.
The State contends that in orally requesting a continuance, the defendant failed to state the substance of Woods’ expected testimony and therefore did not demonstrate either the materiality of his testimony or the necessity of Woods’ presence at trial. Additionally, the State contends that the defendant did not establish a reasonable probability that Woods would be available at the time that the trial would have been continued, nor did the defendant establish due diligence in his efforts to procure Woods’ presence for trial. Accordingly, the State submits that the trial court did not abuse its discretion in denying the defendant’s request for a continuance.
A review of the record indicates that the defendant failed to meet all three of the requirements of La.C.Cr.P. art. 709. Although counsel for the defendant represented to the court that Woods was an *269 alibi witness, and arguably set forth “[fjacts to which [ Mr. Woods] is expected to testify,” as well as the alleged “materiality of the testimony and the necessity for the presence of [Mr. Woods] at the trial,” the other two elements of the Article were not met in this case. See La.C.Cr.P. art. 709.
| ⅞1 Specifically, La. C.Cr.P. art. 709(A)(8) was not met because the defendant did not demonstrate to the trial court “[fjacts showing due diligence used in an effort to procure [his] attendance.” Id. The record indicates that one writ of instanter for Woods[11] was filed on either August 20, 2010, or August 28, 2010, for the original August 25, 2010 trial date, and that a second writ of instanter for Woods was filed on January 11, 2011, the date of trial. However, this evidence alone is insufficient to demonstrate due diligence to procure Woods’ attendance at the January 11, 2011 trial pursuant to La. C.Cr.P. art. 709.
In State v. Plaisance, this Court considered whether a trial court erred in denying a defendant’s oral motion for a two-day recess, after the close of the State’s case, to secure the attendance of a witness for the defense who was purportedly to testify in rebuttal of the State’s introduction of good character evidence of the victim. State v. Plaisance, 2000-1858, p. 28 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193. The witness had left the state, and the defendant was unable to secure the witness’ presence at trial. Id. Although the record did not evidence that the defendant moved for a recess at trial, for purposes of appeal, the Plaisance Court assumed that the motion had been made, holding that the defendant did not demonstrate that the trial court abused its discretion in denying the defendant’s motion for a recess:
The record reflects that at the sentencing hearing the trial court initially considered the defendant’s motion for a new trial, at which defense counsel acknowledged that the witness had been subpoenaed for trial, but failed to appear. Defense counsel offered no explanation for the witness’s absence and failed to show that he had used due diligence to procure his attendance at trial. In view of this, we find the defendant failed to demonstrate a sufficient showing under La. C.Cr.P. art. 709 to justify the granting of a two-day recess to secure the witness.
Id. at p. 29, 811 So.2d at 1193 (emphasis added).
Likewise, in this case, the defendant offered no explanation for Woods’ absence, and the record suggests that neither defense counsel nor Woods’ mother could locate Woods. Defense counsel represented that Woods’ mother indicated that she had not seen him for days and had no knowledge as to Woods’ whereabouts. Accordingly, La. C.Cr.P. art. 709(A)(2) was not met because this alleged information from Woods’ mother does not establish “[fjacts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.” Thus, the record indicates that even if a continuance were granted, it is unlikely that Woods would have been available on the date to which the trial was deferred.
Furthermore, even assuming that as an alibi witness, Woods’ testimony would have been favorable to the defense, the defendant did not demonstrate prejudicial error due to the denial of the continuance because the defendant did not establish that Woods’ testimony would “indicate the possibility of a different result if [Mr. Woods] were to testify.” See State v. Duplessis, *270 2000-2122, p. 13, 785 So.2d at 947.[12] Even assuming arguendo that Woods would testify that the defendant was at work at the time the burglary occurred, considering Haigler’s aforementioned testimony together with the fact that items belonging to Rebecca Paz that had previously been reported stolen from her automobile were recovered |¾⅛ the defendant’s bedroom, the defendant has not established that Woods’ testimony would have indicated the possibility of a different result.
Finally, even if the trial court abused its discretion in denying the defense’s request for a continuance, it is subject to a harmless error standard of review because any error arguably did not contribute to the jury’s verdict in this case. As the Louisiana Supreme Court noted in State v. Haddad:
Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational factfinder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant’s jury. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In that case, the United States Supreme Court stated:
The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.
Id. at 2081.
State v. Haddad, 1999-1272 (La.2/29/00), 767 So.2d 682, 689. Given the testimony adduced at trial, the failure to grant the continuance did not contribute to the verdict.
In the second assignment of error, the defendant argues that the trial court abused its discretion in allowing evidence of his other crimes before the jury that was introduced because the misdemeanor charges were being tried at the same time as the simple burglary charge.
“Generally, evidence of other crimes, wrongs, or acts committed by the defendant is inadmissible due to the substantial risk of grave prejudice to the defendant.’ ” State v. Odenbaugh, 2010-0268, p. 52 (La.12/6/11), 82 So.3d 215, 250, reh’g denied (Jan. 20, 2012), cert. denied, — U.S. -, 133 S.Ct. 410, 184 L.Ed.2d 51 (U.S.2012) (quoting State v. Prieur, 277 So.2d 126, 128 (La.1973)). With regard to the introduction of other crimes evidence, La. C.E. art. 404(B)(1) provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal ease shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial *271 for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The Louisiana Supreme Court has held that “the introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis.” State v. Johnson, 94-1379, p. 17 (La.11/27/95), 664 So.2d 94, 102; see also State v. Smith, 2011-0091, p. 28 (La.App. 4 Cir. 7/11/12), 96 So.3d 678, 695, reh’g denied (Aug. 16, 2012); State v. Bentley, 2002-1564, p. 3 (La.App. 4 Cir. 3/12/03), 844 So.2d 149, 152. If an error is made by the trial court, a reviewing court will consider “whether the guilty verdict was surely unattributable to the error’ ” to determine whether the error is harmless. State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172 (quoting State v. Johnson, 94-1379, p. 17 (La.11/27/95), 664 So.2d 94, 102; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).
In this case, the defendant concedes in his brief that his only objection at trial to the similar crimes evidence was that the jury be instructed on the issue of other crimes evidence. The colloquy regarding the introduction of other crimes evidence occurred at trial as follows:
[^[Counsel for the state]:
The second issue, Judge, with regard to the trial, the State filed a Prieur notice long ago. The record did not reflect a ruling, and I just wanted to confirm that the — that that had been granted, seeking to introduce the res gestae of the possessions of stolen property at the house.
[Counsel for defendant]:
And, Judge, the only objection I would have is that if evidence is allowed to come in that there be a limiting instruction specifically on the issue of the other crimes evidence. [emphasis added]
The Court:
I will have that in my standard instruction.
[Counsel for defendant]:
Thank you, Judge.
The Court:
Well, 12/22/10, [the State] filed a [Pri-eur] notice. And I was closed as of December the 17th. So if you — you’re saying there’s no ruling because I wasn’t here on December 22nd, right?
⅜ * * *
I got you. Okay. All right. The Court’s going to grant the State’s intent to use evidence of similar crimes, that specifically being the other items [stolen from other automobiles]. And the Court will have a limiting instruction to the jury.
The State argues that the defendant’s possession of stolen property from other vehicles was not introduced to establish the defendant’s bad character, but was introduced to prove his commission of the misdemeanor charges that were tried in the same proceeding as the simple burglary charge. The State contends that the defendant did not object to the misdemeanor and felony charges being tried together or attempt to sever the misdemeanor charges. Because the evidence of stolen property from other vehicles provides context of happenings near in time [ 2f¡and place, the State argues that the trial court did not abuse its discretion in admitting the other crimes evidence.
In State v. Malvoisin, this Court quoted the Louisiana Supreme Court’s holding in State v. Brewington that evidence of other crimes is properly admitted if such evidence is so intertwined to the charged offense that the State could not have accu *272 rately presented its case without reference to the other crimes:
Evidence of other crimes is admissible when it is related and intertwined with the charged offense to such an extent that the State could not have accurately presented its case without reference to it. State v. Brewington, 601 So.2d 656 (La.1992).
The concomitant other crimes do not affect the defendant’s character because they were done, if at all, as parts of a whole; thus, the trier of fact will attribute either all of the criminal conduct to the defendant or none of it. Id. Additionally, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. Id.
In State v. Brewington, 601 So.2d at 657, the Court stated:
This court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. State v. Boyd, 359 So.2d 931, 942 (La.1978); State v. Clift, 339 So.2d 755, 760 (La.1976). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, Law of Evidence 448 (2d ed. 1972). The concomitant other crimes do not affect the accused’s character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. 1 Wigmore, Evidence Sec. 218 (3d ed. 1940). State v. Haarala, 398 So.2d 1093, 1097 (La.1981).
State v. Malvoisin, 2000-0485, pp. 5-6 (La.App. 4 Cir. 1/24/01), 779 So.2d 73, 77.
Similarly, in this case, the similar crimes evidence was intertwined with the simple burglary charge, as the detectives’ search of the defendant’s room in his mother’s home was conducted pursuant to the investigation of the stolen chainsaw recovered from the Magazine Street Pawn Shop. The detectives’ search of the defendant’s room revealed evidence of property that had been stolen from the victim in the instant ease, Rebecca Paz, as well as property that had been reported stolen in numerous other burglaries. Thus, we do not find that the trial court abused its discretion in allowing the similar crimes evidence, and that even assuming the trial court had abused its discretion, the guilty verdict was, beyond a reasonable doubt, “surely unattributable” to the admission of such evidence, as evidence of Rebecca Paz’s stolen property was discovered in the defendant’s room. See State v. Robertson, 2006-1537, p. 9, 988 So.2d at 172.
The defendant’s first pro se assignment of error is that the trial court erred in denying his request for a continuance. For the reasons previously stated with regard to counseled assignment of error number one, this assignment of error lacks merit.
The defendant’s second pro se assignment of error is that the trial court erred in admitting other crimes evidence. For the reasons discussed in counseled assignment of error number two, this assignment of error lacks merit.
The defendant’s fourth and final pro se assignment of error is that he was denied his Sixth Amendment right to confront and cross-examine his accusers. The defendant argues that Officer Davis and Det. Barrere testified regarding the *273 | ^defendant’s other crimes, but “[t]he alleged victims of these other crimes were never produced by the prosecution.” The defendant further argues that with regard to Vo’s testimony, “no one testified to ownership of any chainsaw, or that it was stolen” and that the jury was confused because “all of the crimes were tied together.” The defendant also contends that because the State’s case rested upon unproven other crimes and hearsay evidence, he was denied the right to receive a fair trial.
For the reasons discussed in counseled assignment of error number two, this assignment of error lacks merit. Additionally, although the State was not obligated to produce testimony from the burglary victims, the State presented testimony of Rebecca Begtrup, one of the victims of an automobile burglary that is not the subject of this appeal. With regard to the chainsaw, Det. Barrere testified that the chainsaw reported stolen matched the chainsaw pawned by the defendant. Finally, contrary to the defendant’s assertions, the State presented evidence and testimony regarding the simple burglary in the instant case, including testimony from the victim, Rebecca Paz. As for any alleged hearsay connected to the other burglaries, there was no objection to this evidence on the basis of hearsay. Thus, any alleged error was not preserved for appeal pursuant to La. C.Cr.P. art. 841.
For the foregoing reasons, we affirm the defendant’s conviction and sentence.
AFFIRMED

. The case number for the misdemeanor charges was 491-770. These counts were the subject of the State's Prieur notice.

. The trial court acknowledged that the pre-sentence investigation revealed an extensive criminal record, including a juvenile conviction for armed robbery in 1971 for which defendant received juvenile life.

. See State v. Taylor, 2011-K-1077 (La.App. 4 Cir. 8/12/11), unpub.

.Paz testified that she could not recall the exact date of the automobile burglary, which occurred on July 18, 2009. She also could not recall what time that the incident occurred.

. The description of the perpetrator in the initial police report was “[a]n unidentified black male wearing a blue sports jersey and blue jeans.”

. Counsel for the defendant approached the bench with a document, and a bench conference ensued. The State objected to the document, and the trial court sustained the objection. Counsel for the defendant requested that the trial be continued "until we can get someone here ... [to] authenticate the document.” The trial court denied the request. Counsel for the defendant noticed intent to seek supervisory writs and requested a stay, which the trial court denied, noting the intent to take a writ. There is no evidence that a writ was ultimately taken from the denial of the request for a continuance. Counsel for the defendant proffered the document as Defense Exhibit Three. After the close of the trial and the jurors were excused, counsel for the defendant noted an objection for the record, indicating that the unauthenticated document that was the subject of the State’s objection was a time sheet purportedly verifying the defendant’s presence at work on the date of the incident.

.His uncle, Charles Taylor, and his uncle’s girlfriend would also stay at the house occasionally. The defendant denied that it was "his room” and testified that he slept in the living room. The State showed Defendant Exhibit Twenty-two, which consisted of the papers bearing defendant's name which were *263 recovered from the bedroom, at which time the defendant confirmed that they were his papers. Id. When asked if someone else had gathered all the stolen items belonging to different individuals and brought them to his room on Chippewa Street, the defendant responded, "I don’t know” and insisted that he was at work that day.

. La. R.S. 14:62(A). La. R.S. 14:60 governs aggravated burglary and provides as follows:
Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3)Commits a battery upon any person while in such place, or in entering or leaving such place.
Whoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years.

. La. C.Cr.P. art. 708 provides:
A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced.
In any event, however, ‘‘[a] motion for a recess is evaluated by the same standards as a motion for a continuance.” State v. Plaisance, 2000-1858, p. 29 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193 (citing State v. Hodges, 98-0513 (La.App. 4 Cir. 11/17/99), 749 So.2d 732, 739).

. The record indicates no writ was taken on the denial of the motion for a continuance.

. Writs of instanter were also filed to command Luis Lizama's presence at trial.

. The State argues that the defendant failed to object to the trial court's denial of his continuance and that pursuant to La. C.Cr.P. art. 841, the issue is not preserved for appeal. However, the trial transcript evidences that defense counsel objected to the trial court’s denial of the request for a continuance after the sidebar conference, during which time defense counsel indicated a need for a continuance to secure Woods' presence and testimony at trial.